**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NORMAN WILLOX :
:
:
v. : Civil No. CCB-13-2096
:
MICHAEL LADAS, ET AL. :
:

**MEMORANDUM**

Plaintiff Norman Willox brings this action against Michael Ladas, EPIC Yachting LLC ("EPIC"), and Mid Atlantic Marine Group LLC ("MAMG") for breach of contract, conversion, breach of fiduciary duty, constructive fraud, and fraudulent conveyance. Defendant Ladas filed counterclaims for breach of contract, unjust enrichment, and fraudulent inducement.[1] The defendants' motion for summary judgment and the plaintiff's motion to dismiss Ladas's counterclaims and to amend his own complaint are pending. (ECF Nos. 20, 42, 43.) The parties have fully briefed the issues and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the motions to dismiss and for summary judgment will be granted, and Willox's motion to amend his complaint will be denied.[2]

**BACKGROUND**

On September 2, 2008, Willox entered into a Membership Interest Purchase Agreement ("MIPA") with MAMG.[3] (MIPA, ECF No. 43-3). Ladas was the manager of MAMG.

[1] The parties subsequently stipulated to dismissal of Ladas's counterclaims for fraudulent inducement and breach of contract as it relates to Willox's failure to contribute $300,000 to MAMG. (Stipulation, ECF No. 28.)
[2] The parties also have filed motions related to expert disclosures and admissions. (ECF Nos. 19, 22.) The court's disposition of the parties' other motions renders these motions moot.
[3] The parties dispute whether it was Willox that entered the agreement or MPL Properties LLC ("MPL"), his company. MPL is listed as the Investor in the MIPA, (MIPA, ECF No. 43-3, at 1), and Willox is listed as the owner of the membership and economic interest in the Operating Agreement, (Operating Agreement, ECF No. 47-6, at

(Operating Agreement, ECF No. 47-6, § 1.01(p).) Under the terms of the MIPA, Willox obtained a one-third membership interest in MAMG. (MIPA § 1.01.) In exchange, Willox agreed to provide $300,000 to secure financing to buy a new Ocean Alexander yacht ("the OA74"),[4] to execute a personal guarantee for the financing, and to make monthly contributions to pay for interest payments, insurance, maintenance, and other costs ("the carrying costs") related to the OA74. (*Id.* § 1.03.) Under the MIPA, "upon request of [Willox]," MAMG was to provide access to "copies of all [MAMG] books and records applicable to determination of amounts due" to cover the OA74's carrying costs. (*Id.*)

Although Willox had a membership interest of one-third in MAMG, his "Economic Interest" was limited to "revenues and expenses related only to the [OA74]." (*Id.* at § 2.01.) Specifically, the MIPA conferred on Willox fifty percent of any net profits earned from the OA74 and one-hundred percent of any net losses. (*Id.* § 2.01.) It expressly provided that Willox did not acquire an economic interest in any other component of MAMG's inventory or operations. (*Id.*) "Upon sale of the [OA74] to a third party by [MAMG]," the MIPA provided that the sale "funds shall be distributed to [Willox] in accordance with the flow of funds" set out in the MIPA. (*Id.* § 2.01; *see also id.* Ex. A.) Upon the yacht's sale, the MIPA also obligated MAMG to return Willox's initial investment used to obtain financing. (*Id.* § 3.06.)

MAMG purchased the OA74 on September 22, 2008, for $2,268,835. (Willox Aff., ECF No. 47-3, ¶ 12; April 2012 Accounting Records, ECF No. 47-19, at 1.) There is no evidence in

---

17.). This dispute is not material to the court's decision in this case and, to avoid confusion, the court will refer to Willox as the proper investor as he, not MPL Properties, is the party bringing suit.

[4] Although the MIPA states that Willox was to invest $300,000 in MAMG, the parties appear to agree that he actually only invested $200,000 initially, and that he was not required to provide more. (*See, e.g.*, Ladas Dep., ECF No. 47-11, at 39:22–40:9 (stating the investment was made so that MAMG could obtain a larger line of credit and that, although the bank initially wanted $300,000 to extend the line, it lowered the required investment to $200,000 after the MIPA was executed).)

the record that Willox made monthly payments for the OA74's carrying costs as agreed in the MIPA. Instead, Willox had MAMG sell a 2005 Cruisers Motoryacht ("the Cruisers") in June 2009 and reinvested the proceeds—$241,300—back into MAMG. (Cruisers Purchase Agreement, ECF No. 47-8; Willox Dep., ECF No. 43-2, at 77:1–12; April 2012 Accounting Records, at 1.) Willox claims that MAMG and Ladas never provided him with invoices as to the OA74's carrying costs. Although in his affidavit Willox claims he routinely asked for such information, (Willox Aff., ECF No. 47-3, ¶¶ 13–16), in his deposition, he stated he did not recall ever asking for the information during the period that MAMG owned the OA74, (Willox Dep. at 81:7–82:6).[5] Further, Willox testified in his deposition that, despite Ladas offering him access to MAMG's online accounting records, he never took him up on the offer. (*Id.* at 80:8–81:2.)

On October 27, 2009, MAMG sold the OA74 for a "net purchase price" of $2,535,000. (OA74 Purchase Agreement, ECF No. 43-5, at 1.) The buyer paid the purchase price with $1,485,000 in cash and a vessel, a Hatteras 55 Convertible ("the Hatteras"), with a trade allowance of $1,050,000. (*Id.* at 1.) Further, according to the OA74 Purchase Agreement, MAMG was to pay for the yacht's storage costs through May 2010. (*Id.* at 3).

After the sale, in Willox's capital account, Ladas recorded the cash payment as well as what Ladas estimated would be the sale value of the Hatteras, which was far less than the $1,050,000 trade allowance listed in the OA74 Purchase Agreement. (August 2010 Accounting Records, ECF No. 47-7, at 3; Ladas Dep., ECF No. 47-11, at 122:16–21.) According to Ladas, any correspondence related to the OA74 sale would have indicated that the final value of the sale would not be determined until the Hatteras sold, (Ladas Dep. at 122:11–21), although there is no evidence of any such correspondence. The Hatteras ultimately sold for $630,000, in February

[5] To the extent Willox's affidavit conflicts with his sworn deposition testimony, it will be disregarded. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512–13 (4th Cir. 2011).

2011, and that amount was credited to Willox's capital account. (April 2012 Accounting Records, ECF No. 47-8, at 1.) If that value is used to measure the final sale price of the OA74, then the vessel sold at a loss of over $150,000. Under the terms of the MIPA, Willox would be responsible for such a loss. (MIPA § 2.01.)

Willox claims that Ladas improperly calculated the profits, or losses, from the OA74's sale by using the ultimate sale price of the Hatteras instead of the purchase price of the OA74 at the time it was sold. According to Willox, instead of paying him what he was owed after the sale, MAMG, and Ladas as its manager, misrepresented the result of the sale and converted the profits due to Willox toward other ventures and accounts.

Willox filed this suit on May 13, 2013. He seeks damages for breach of contract, conversion, and fraudulent conveyance by MAMG, and another of Ladas's companies, EPIC, which Willox alleges is a successor in interest to MAMG. He also seeks damages from Ladas, individually, for conversion, breach of fiduciary duty, constructive fraud, and fraudulent conveyance. Ladas counterclaimed for breach of contract and unjust enrichment. His claims are based on allegations that Willox never paid the carrying costs for the OA74 and the Hatteras, never paid for losses suffered on the sale of the OA74, and used MAMG's brokerage services to sell the Cruisers without paying for such services.

## ANALYSIS

### I. Willox's Motion to Dismiss Ladas's Counterclaims

When ruling on a motion under Federal Rule of Civil Procedure 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v.*

*United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Walters*, 684 F.3d at 439 (citations omitted) (quoting *Twombly*, 550 U.S. at 570).

**A. Breach of Contract**

Ladas alleges Willox breached the MIPA and Operating Agreement by not paying for the carrying costs of the OA74 and the Hatteras and by not paying for the losses on the sale of the OA74. Willox argues Ladas's claims must be dismissed because the terms of the agreements unambiguously did not obligate Willox to pay for the carrying costs of the Hatteras and did not allow the ultimate sale price of the Hatteras to be factored into the OA74 profit determination

such that it would result in a loss.

Under Maryland law, the unambiguous terms of a contract will govern the parties' rights irrespective of the parties' intent when entering into the contract. *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). A contract is unambiguous where it is not subject to more than one interpretation "when read by a reasonably prudent person." *Id.* at 547. With respect to Ladas's claims that Willox was responsible for the Hatteras's carrying costs, the language of the MIPA is unambiguous: "[Willox's] Economic Interest . . . shall be limited to revenues and expenses related only to the [OA74]" and "[u]nless otherwise agreed in writing, [Willox] shall have no Economic Interest with respect to any other inventory of the Company or any other activities of the Company."[6] (MIPA at ¶ 2.01.) Under any reasonable interpretation of this language, the Hatteras's carrying costs were not "expenses related only to the OA74." The Hatteras was entirely different inventory. Further, Ladas does not allege that Willox ever entered a separate agreement to pay for expenses associated with the Hatteras. He thus fails to state a claim for breach of contract on the basis of Willox's failure to pay the Hatteras's carrying costs.

Ladas's next contract claim is based on his argument that the final sale price of the Hatteras, not its trade allowance value, was the relevant number for calculating whether the OA74 sold at a profit. According to Ladas, because the Hatteras only sold for $630,000, the OA74 ultimately sold at a loss, for which Willox was responsible under the MIPA. To support

[6] Although Ladas did not attach the MIPA or the Operating Agreement to his countercomplaint, he incorporated them by reference and attached them to his opposition memorandum and the court may refer to them in deciding the motion to dismiss. Willox does not dispute their authenticity. "[W]hen a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (alterations in original) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).

his position, Ladas claims the Hatteras was property "contributed by the Member [Willox] to the Company," under the terms of the Operating Agreement, which is incorporated into the MIPA by reference. (*See* Operating Agreement § 8.03(a)(II); MIPA § 2.01.) The Operating Agreement provides that the account of a member contributing such property to MAMG should be credited only for that property's fair market value. (*See* Operating Agreement § 8.03(a)(II).)

This is an inaccurate reading of the agreements. According to the flow of funds chart attached to the MIPA, it was the OA74's "sale price" that was to be used to calculate net profits, (MIPA Ex. A), not the ultimate sale value of any property MAMG may have received as part of the payment package and later sold. If Ladas's understanding were correct, and thus the determination of the value of the OA74 turned on the final sale of the Hatteras, MAMG could keep selling vessels for trade-in vessels in perpetuity, such that the sale value of the OA74 could never be determined. This is not what a prudent person interpreting the contract would understand given the parties' express agreement that Willox's economic interest would extend to no MAMG inventory other than the OA74. (*See* MIPA § 2.01.) The court finds the contract required the profits or losses on the sale of the OA74 to be calculated based on the purchase price listed in the OA74 Purchase Agreement of $2,535,000. (OA74 Purchase Agreement at 1.)

As to Ladas's effort to enforce Willox's alleged obligation to pay the OA74's carrying costs, that claim is time barred. Under Maryland law, the statute of limitations for contract claims is three years. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101; *Kumar v. Dhanda*, 43 A.3d 1029, 1033–34 (Md. 2012) (applying Md. Code Ann., Cts. & Jud. Proc. § 5-101 to a breach-of-contract claim). "In breach of contract cases, a cause of action typically accrues at the time of the breach." *Kumar*, 43 A.3d at 1035. Here, the OA74 was sold in October 2009 and MAMG

remained responsible for storage of the vessel through May 2010. (OA74 Purchase Agreement, at 5.) The MIPA obligated Willox to make monthly capital contributions equal to the carrying costs "incurred by the Company in the previous month" for the OA74. (MIPA § 1.03). Even if Willox's alleged obligation to cover carrying costs extended through May 2010, then his final breach of that obligation would have occurred in June 2010 at the very latest. Yet Ladas failed to assert his claim until October 17, 2013—months after the limitations period had run. Ladas disagrees, arguing that Willox's discharge of his contractual duties could not be evaluated before the disposition of the Hatteras. As noted, however, Willox's obligations did not extend to the Hatteras.

For these reasons, Ladas's claims for breach of contract will be dismissed.

**B. Unjust Enrichment**

Ladas's claim for unjust enrichment is also barred by the statute of limitations. Maryland courts have indicated that a three-year statute of limitations applies to unjust enrichment claims. *See Llanten v. Cedar Ridge Counseling Ctrs., LLC*, 75 A.3d 1030, 1034 (Md. Ct. Spec. App. 2013) (applying the three year statute of limitations period articulated in Md. Code Ann., Cts. & Jud. Proc. § 5-101 to an unjust enrichment claim); *Balt. City Bd. of Sch. Comm'rs v. Koba Inst., Inc.*, 5 A.3d 60, 72 (Md. Ct. Spec. App. 2010) ("[W]e believe that the three-year period set forth in CJP § 5-101 would control an unjust enrichment claim."). A claim "founded simply upon an implied obligation to pay for services rendered . . . accrued as the services were performed." *Dempsey v. McNabb*, 21 A. 378, 379 (1891). Here, the limitations period began to accrue when Willox derived the benefit of MAMG's brokerage services via MAMG's sale of the cruisers in

June 2012. That period, therefore, ran in June 2012, well before Ladas filed his counterclaims in October 2013.

Ladas seeks to avoid this outcome, arguing Maryland's "discovery rule" should apply to his claims because he could not have known Willox would not pay the brokerage fee until he realized Willox's capital account as a member of MAMG carried a negative balance. "The 'discovery rule' operates as an exception to the accrual rule when a plaintiff does not know, or could not through the exercise of reasonable diligence know, of the wrong, whether the wrong is a breach of a tort duty or a breach of contract." *Kumar v. Dhanda*, 17 A.3d 744, 748 n.2 (Md. Ct. Spec. App. 2011), *aff'd*, 43 A.3d 1029 (Md. 2012). Inquiry notice of a potential claim precludes application of the discovery rule. *See Georgia-Pac. Corp. v. Benjamin*, 904 A.2d 511, 528–29 (Md. 2006); *Lutheran Hosp. of Md. v. Levy*, 482 A.2d 23, 27 (Md. Ct. Spec. App. 1984). Although not alleging it in his countercomplaint, Ladas claims in his opposition memorandum that he "had no reason to suspect that the brokerage fee would not be paid from Willox's profits on the sale of the OA74." (Plf.'s Opp'n, ECF No. 23, at 7–8.) Even assuming the wrong for purposes of unjust enrichment could not be known until a demand for payment is made and refused—a position Maryland courts seem unlikely to accept, *see Balt. City Bd. of Sch. Comm'rs*, 5 A.3d at 72–73 (predicting, without deciding, that no "period of demand and refusal is tacked on to the point when services were last rendered")—Ladas's argument is without merit. Ladas would have known immediately upon sale of the Cruisers that MAMG was owed a brokerage fee. Further, he does not allege that he ever charged Willox's capital account with the fee.[7] Nor does he allege that he was unable to deduct the brokerage fee from the proceeds of the sale before applying the funds to Willox's capital account, as it presumably would be in his

[7] Given the accounting records attached with the parties' summary judgment papers, (*see* April 2012 Accounting Records, at 1), it appears he could not plausibly allege such a fact.

power to do.[8] Ladas was on inquiry notice as to his claim for payment when he sold the vessel in June 2009. His unjust enrichment claim will be dismissed.

**II. The Defendants' Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

[8] He may not have done so if the Cruisers were actually given as a contribution to the capital account in the first place, as Willox claims. (*See* Reply Mem. Supp. Mot. Dismiss, ECF No. 27, at 6.) Neither the MIPA nor the Operating Agreement subject property contributed by a member to a brokerage fee when it is sold. To the contrary, the Operating Agreement indicates that the account of a member contributing such property should be credited with the fair market value of that property. (*See* Operating Agreement § 8.03(a)(II).)

Willox's claims are time barred.[9] Maryland's three-year statute of limitations applies to all of Willox's claims. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101. Thus, his claims must have arisen on May 13, 2010, or later, for them to be timely, because he filed this suit on May 13, 2013. "Ordinarily, [the general three-year] statute of limitations begins to 'accrue' on the date of the wrong." *Kumar*, 17 A.3d at 748. Here, all Willox's claims arise from MAMG's failure to pay him the proceeds he was due for the OA74's sale, which, as is evident from the discussion above, occurred in October 2009. His claims, therefore, are time barred and judgment will be entered in favor of the defendants.

Willox makes two arguments as to why October 2009 is not the correct date from which to run the limitations period. First, he argues some of his claims arise from conduct that occurred much later, in 2011, when MAMG sold the Hatteras and when Ladas improperly closed the business. (*See* Plf.'s Opp'n, ECF No. 47, at 7.) The court disagrees. Willox does not claim that the money from the sale was paid to him or credited to his capital account and then removed by Ladas or MAMG. In fact, he does not claim his capital account ever had a positive balance that was never distributed to him.[10] Instead, his claims rest on the argument that he *should* have had a positive balance in his capital account because the sale of the OA74 resulted in profits and, under the MIPA and Operating Agreement, fifty percent of those profits were owed to him. (*See* MIPA § 2.01 ("Upon sale of the [OA74] to a third party by [MAMG], funds shall be distributed to [Willox] . . . ."); Operating Agreement § 8.03(a)(III) ("Each Member's Capital Account will be increased by . . . Allocations to the Member of Net Profits . . . .").) Willox was not wronged

[9] Because the court finds Willox's claims are time-barred, the court need not address the defendants' arguments that Willox lacks standing; that MAMG, Ladas, and EPIC are not subject to suit; and that the economic loss doctrine bars Willox's tort claims.

[10] It appears he could not make such a claim as the only evidence of what was in his account indicates that it carried a negative balance. (August 2010 Accounting Records, at 4 (showing a negative capital account balance); April 2012 Accounting Records, at 3 (same).)

when the defendants decided to invest the profits from the sale of the OA74 into other endeavors or to transfer it to other accounts; rather, he was wronged, if at all, when the sale proceeds were not applied to his capital account at the time of the sale in October 2009.

Willox also argues that Maryland's discovery rule should apply to toll the statute of limitations because he could not have known until much later that the sale of the OA74 resulted in profits. As already mentioned, the "discovery rule" delays accrual of the limitations period until a plaintiff is on inquiry notice of the wrong. *See Kumar*, 17 A.3d at 748 n.2. According to Willox, the "Net Profits" from selling the OA74 could not be determined until the carrying costs for which he was responsible under § 1.03(c) of the MIPA were clarified and thus could be deducted from the OA74's purchase price. (Plf.'s Opp'n, ECF No. 47-1, at 4–7.) Willox claims that he could not have known what carrying costs he was responsible for until, at the earliest, the end of May 2010, when MAMG's obligations to pay for the OA74's storage ended under the Purchasing Agreement, (*see* Purchasing Agreement at 3), or much later due to Ladas's alleged non-responsiveness when Willox sought documentation of the status of his capital account, (*see*, *e.g.*, Emails, ECF Nos. 47-12, 47-16, 47-17, 47-18 (seeking information regarding the status of Willox's investment in MAMG)).

Exhibit A to the MIPA is clear, however, that the carrying costs of the OA74 were to be disregarded for the purpose of calculating any profits from the sale of that vessel. (*See* MIPA Ex. A (stating that basis for calculating the Economic Interest and "specifically Net Profit or Net Loss DOES NOT include interest, insurance, maintenance and other general expenses of MPL Properties LLC" (emphasis in original)).) Thus, although the carrying costs Willox owed were relevant to determining the overall balance of his capital account, (*id.* § 1.03(c) ("[Willox] shall

make monthly contributions to [MAMG] in an amount equal to amounts incurred . . . for interest payments, insurance, maintenance and other costs directly related to the [OA74].")), they had no bearing on what profits from the sale of the OA74 should have been distributed to the capital account in the first place.

With carrying costs irrelevant to Willox's determination as to whether the profits from the OA74's sale were properly distributed to his account, the evidence demonstrates that he had access to sufficient information to be on inquiry notice of his claim at the time of the sale. He testified at his deposition that he was aware of the deal to sell the OA74 at the time of the sale because Ladas would have told him of the transaction. (Willox Dep. at 66:8–9 ("The only thing I remember is Mike bringing to me the deal, you know, verbally."), 66:13–17 (testifying that he remembered Ladas presenting the deal to sell the OA74 to him), 71:5–21 (testifying that, at the time of the sale, Willox believed the sale had resulted in a profit based on his conversations with Ladas about the transaction.) He provides no evidence that he was unaware of the initial acquisition cost of the yacht such that he could not calculate the difference in the acquisition price and the sale price. According to the MIPA, the only additional number Willox would have needed to determine the final profits of the sale was how much MAMG spent on marketing expenses to sell the vessel. (*See* MIPA Ex. A; *id.* § 3.02.) This amount, however, was limited by the MIPA to, at most, three percent of the total acquisition cost of the OA74. (*See Id.* § 3.02.) Knowing the initial acquisition price, Willox thus could have calculated the highest possible amount of marketing expenses that would be deducted well before the OA74 was even sold.[11]

---

[11] Because the acquisition cost of the OA74 was $2,268,835, (August 2010 Accounting Records, at 1), the most MAMG could have spent on marketing would have been $68,065.05. With the difference in the acquisition cost and purchase price of the OA74 being $266,165, even deducting the marketing costs, Willox would have been aware he was due a profit.

Further, even to the extent Willox claims he needed access to the accounting records to get a clear picture of whether the yacht was sold at a profit, Ladas had offered him access before. (Willox Dep. at 80:8–21 (testifying that when Willox initially invested in MAMG, Ladas told him one or two times he could view the company's accounting records online).) Willox never took him up on the offer, however, because he claims he did not have the time and he trusted Ladas. (*Id.* at 81:1–5; *see also id.* at 81:7 –82:6 (testifying he does not recall ever asking to see the accounting records during the time MAMG owned the OA74).) Willox's failure to access accounting records related to the sale are thus not the result of circumstances outside his control or even the product of Ladas's evasion. If he had looked at the records, even several months later, he would have seen that they did not properly reflect a payout of the profits. (*See* August 2010 Accounting Records, at 3 (listing the full amount of the cash payment given for the OA74 and the estimated sale value, instead of the trade allowance value, of the Hatteras, and not listing any net profits).) In any event, the discovery rule sets accrual at the date the claimant gains knowledge sufficient to put him on inquiry notice, not at the date upon which the claimant's investigation into the full extent of the claim is concluded. *See Georgia-Pac.*, 904 A.2d at 528–29; *Lutheran Hosp.*, 482 A.2d at 27. Willox had sufficient knowledge—the terms of the MIPA and the Operating Agreement for calculating and allocating net profits, the initial acquisition cost of the OA74, and the terms of the deal to sell the OA74—to put him on inquiry notice in October 2009 that he had a claim. His claims, therefore, are barred and judgment will be entered in favor of the defendants.

**III. Willox's Motion to Amend His Complaint**

Willox seeks to amend his complaint to add an additional breach of contract claim for MAMG's failure to return his $200,000 investment, which MAMG used to obtain financing upon the sale of the OA74, (*see* MIPA § 3.06), and to add additional defendants whom Willox claims are successors in interest to MAMG.

Willox's motion will be denied because any amendment would be futile. *See HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) ("A motion to amend should be denied [when] . . . the amendment would be futile.") (internal citation and quotation marks omitted). First, Willox's new claim for breach of contract would be time barred for the same reasons that his other claims are barred. MAMG was required to return the investment to him upon sale of the yacht in October 2009, more than three years before he filed suit. To the extent Willox offers the same allegations for application of the discovery rule that he offered in response to the defendants' motion for summary judgment as to his existing claims, the rule is similarly inapplicable. He was on notice in October 2009 that he was owed the $200,000 because the requirement that his deposit be returned to him upon sale of the yacht was expressly listed in the MIPA. (*See* MIPA § 3.06.) In addition, it would be futile to add additional defendants against whom Willox seeks to bring the same claims that this court has already determined are time barred. Willox's motion will be denied.

**CONCLUSION**

For the foregoing reasons, Willox's motion to dismiss and the defendants' motion for summary judgment will be granted. Willox's motion to amend his complaint will be denied. A separate order follows.

September 18, 2014
Date

/S/
Catherine C. Blake
United States District Judge